UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
UNITED STATES OF AMERICA,          :

                                        :                 **OPINION AND ORDER**

         -against-                  :                   07-CR-140 (DLI)

                                          :

VALENTIN MOSQUERA,               :

                                          :

               Defendant.              :
-------------------------------------------------------- x
**DORA L. IRIZARRY, U.S. District Judge:**

        Defendant Valentin Mosquera ("Defendant") stands accused of seven violations of supervised release: (1) failure to report to Probation; (2) drug use; (3) failure to participate in drug treatment; (4) criminal possession of a firearm related to a September 1, 2011 incident; (5) criminal possession of a firearm related to a March 12, 2012 incident; (6) possession of a controlled substance; and (7) resisting arrest. (Violation of Supervised Release Report ("VOSR Report"), Doc. Entry No. 40; Addendum to Violation of Supervised Release Report (Add. to VOSR Report"), Doc. Entry No. 46.) Defendant does not contest Charges One, Two, or Three.[1]

        A two-day evidentiary hearing was held on May 20 and 21, 2013, with respect to Charges Four through Seven ("VOSR hearing"). Prior to the hearing, Defendant moved to preclude the admission of alleged oral and written hearsay statements of Aisha Council ("Council"), whom the government would not be calling to testify at the VOSR hearing. (Def.'s Mot. *In Limine* (Def. Mot.), Doc. Entry No. 71.) The government opposed the motion. (Gov't Opp. to Def.'s Mot. *In Limine* ("Gov't Opp."), Doc. Entry No. 73.) The Court reserved decision and permitted the parties to elicit evidence during the hearing relevant to the merits of the motion.

        For the reasons set forth below, Defendant's motion *in limine* is denied and Defendant is found to have violated Charges Four, Five, Six, and Seven by a preponderance of the evidence.

---

[1] Defendant pled guilty to Violation Charges One, Two, and Three on May 30, 2013. (*See* 5/30/13 Min. Entry.)

## BACKGROUND

On November 13, 2007, Defendant pled guilty to distribution and possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). (11/13/07 Min. Entry, Doc. Entry No. 30; *see also* Indictment, Doc. Entry No. 15.) On April 3, 2008, Defendant was sentenced to 60 months' imprisonment, four years of supervised release with special conditions, and a $100 special assessment. (Sentencing Min. Entry, Doc. Entry No. 33; Judgment, Doc. Entry No. 34.) The special conditions directed that Defendant: (1) participate in a drug treatment program as approved by Probation; (2) not possess a firearm, ammunition, or destructive device; (3) maintain lawful, verifiable employment as directed by Probation; and (4) participate in a GED and/or vocational training program ("Special Conditions of Supervision"). (*See* Judgment at 4.)

On or about June 22, 2011, Probation Officer Gregory Carter reviewed the Judgment with Defendant that included both the Standard Conditions of Supervision and the Special Conditions of Supervision. (5/28/13 Stipulation ¶ 1, Doc. Entry No. 74.) That same day, Defendant signed the Judgment, acknowledging that "[t]hese conditions have been read to me. I fully understand the conditions and have been provided a copy of them." (5/28/13 Stipulation ¶ 2.) On June 17, 2011, Defendant began his term of supervised release.

## FACTUAL FINDINGS

The following facts surrounding the charged violations were adduced at the VOSR hearing through witness testimony and factual stipulations entered into by the parties. (*See* Stipulations, GX 21, 22; 5/28/13 Stipulation.)[2] The following witnesses testified on behalf of the government: New York Police Department ("NYPD") Detective John Kelly ("Detective Kelly")

---

[2] "GX" refers to the government's exhibits and "DX" refers to Defendant's exhibits introduced at the VOSR hearing. "Tr." refers to the transcript of the May 20 and 21, 2013 VOSR hearing.

who is assigned to the New York/New Jersey Regional Fugitive Task Force ("RFTF"); United States Marshals Service ("USMS") Supervisory Inspector Edward McMahon ("Inspector McMahon") assigned to RFTF; United States Department of Homeland Security ("DHS") Special Agent Christopher Quinn ("Special Agent Quinn") assigned to Homeland Security Investigations; Wing Wong ("Wong"), Criminalist Level Two of the New York City Office of the Chief Medical Examiner, Department of Forensic Biology; USMS Inspector Sandy Rao ("Inspector Rao") assigned to RFTF; NYPD Officer Michael Grimm ("Officer Grimm") assigned to the 110th Precinct; United States Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Special Agent Renee Repasky ("Special Agent Repasky"). Defendant presented no case. The Court found the testimony of the government witnesses credible.

## I. Events of September 1, 2011

Officer Grimm was the sole witness to testify in connection with Charge Four, criminal possession of a firearm, and the events that allegedly occurred on September 1, 2011 in Queens, New York.[3] (*See* Tr. 192:1-217:2.) At the time, Officer Grimm was assigned to the Anti-Crime Unit charged with the task of combatting street level violent crimes. (Tr. 192:15-20.) On September 1, 2011, Officer Grimm and his partner, NYPD Officer Marciano, pulled over a white Nissan vehicle for failing to stop at two stop signs. (Tr. 194:2-9.) Defendant was driving the vehicle and Tyrell Newkirk ("Newkirk"), a convicted felon, was in the front passenger seat. (Tr. 195:20-196:1, 196:14-20, 203:7-10.) As Officer Grimm approached the stopped vehicle, he smelled marijuana emanating from the open windows of the vehicle. (Tr. 194:11-13.)

---

[3] Defendant has a pending New York State, Queens County Supreme Court criminal case relating to the events of September 1, 2011 underlying Charge Four. *People v. Valentino Mosquera*, Case No. 03403-2011. In the State action, he has been charged with Criminal Possession of a Weapon in the Second Degree in violation of New York State Penal Law ("NYSPL") Section 265.03(1)(b), a Class C Felony; Criminal Possession of a Weapon in the Third Degree in violation of NYSPL Section 265.02(1), a Class D Felony; Criminal Possession of a Weapon in the Second Degree in violation of NYSPL Section 265.03(3), a Class C Felony; and Criminal Possession of a Weapon in the Third Degree in violation of NYSPL Section 265.02(3). *Id.*; (*see also* 10/15/12 Probation Status Report, Doc. Entry No. 55.)

Officer Marciano approached the passenger side of the vehicle as Officer Grimm approached the driver's side. (Tr. 194:14, 207:7-10.) Officer Grimm saw Newkirk on the passenger side, laying in a prone position, having reclined the seat all the way back. (Tr. 196:14-20, 207:2-6.) Both officers were familiar with Newkirk as a neighborhood narcotics trafficker with prior felony convictions. (Tr. 202:10-19, 203:7-10.) However, as Officer Grimm approached the vehicle he thought only the Defendant was inside. (Tr. 196:23-25.)

Officer Grimm asked Defendant for his license, registration, and insurance card and Defendant provided him with a North Carolina driver's license bearing his name and picture. (Tr. 194:14-15, 194:23-25, 195:13-196:6; GX 25.) Defendant also provided a copy of the rental agreement for the vehicle with his name on it, which Defendant reached over and retrieved from the glove compartment located on the passenger side. (Tr. 194:22-25, 209:13-17.) Officer Grimm then asked Defendant to step out of the vehicle in order for Officer Grimm to frisk him for any weapons. (Tr. 197:16-22.) Defendant complied and walked to the rear of the vehicle and Officer Grimm frisked him. (*Id.*) At this time, Newkirk had also stepped out of the vehicle and Officer Marciano frisked him. (Tr. 197:23-198:1.)

While standing outside the vehicle, Officer Grimm then conducted a visual search of the open compartments inside the vehicle and the floorboard next to the seats. (Tr. 198:3-12.) Upon bending down to look at the passenger-side floorboard, Officer Grimm saw the butt of a firearm protruding from underneath the front passenger seat. (Tr. 198:9-12, 214:21-25.) Officer Grimm did not physically reach under the passenger seat to discover the firearm, he only reached for the firearm once he had discovered it visually. (Tr. 214:17-25.) Officer Grimm placed the firearm in his waistband, walked to the back of the vehicle, and asked Defendant and Newkirk to place their hands on top of the vehicle. (Tr. 198:16-19.) Defendant fled the scene immediately. (Tr.

199:19.)  Newkirk began fighting with both officers and subsequently was taken into custody.  (Tr. 198:20-21.)  Officer Grimm's efforts to locate Defendant that night were unsuccessful.  (Tr. 198:22-199:2.)

The firearm recovered from the vehicle was an operable Lorcin Engineering .380 caliber pistol, with one live round in the chamber and five rounds in the magazine.  (Tr. 199:3-7, 199:18-200:13; GX 26.)  In addition, the serial number was scratched off the firearm.  (Tr. 199:8-11.)

## II.    Events of March 12, 2012

Detective Kelly, Inspector McMahon, Special Agent Quinn, Inspector Rao, and Special Agent Repasky, each testified in connection with Charge Five, criminal possession of a firearm, Charge Six, possession of a controlled substance, Charge Seven, resisting arrest, and the events that allegedly occurred on March 12, 2012.  Wong, the government's DNA expert, testified only as to Charge Five.

On September 28, 2011, this Court issued an arrest warrant for Defendant based on the events that serve as the basis for Charges One through Four.  (*See* Doc. Entry No. 41.)  Inspector Rao was the lead investigator on Defendant's fugitive case and developed information that Defendant was residing in an attached one or two-family residence above a storefront on Nostrand Avenue in Brooklyn, New York.  (Tr. 50:9-10, 154:2-23, 155:1-5.)  On the morning of March 12, 2012, an "arrest team" comprised of ten to twelve members of the New York/New Jersey Regional Fugitive Task Force ("RFTF") went to an apartment located at 1215 Nostrand Ave in Brooklyn and arrested Defendant on the outstanding warrant.  (Tr. 13:8-23, 15:4-5, 27:18-20, 45:21-46:6, 154:20-23, 155:14-24.)  RFTF is a task force designated to locate and apprehend violent fugitives and is comprised of members of the Drug Enforcement Agency

("DEA"), ATF, USMS, New York State Police, NYPD, and New York State Parole. (Tr. 14:2-7, 27:21-24.) The members of the arrest team were wearing tactical vests and jackets that had distinctive markings saying "Police" or "U.S. Marshals" on the front and the back, and shields around the neck. (Tr. 14:23-24, 46:13-17.) In the course of the arrest, they recovered, *inter alia*, a loaded firearm and ammunition, narcotics, drug paraphernalia, and documents relating to Defendant.

### A.    The Arrest at 1215 Nostrand Avenue

1215 Nostrand Avenue is one of three adjacent buildings with residences located on the second floor above street level storefronts. (Tr. 155:2-5.) The apartment has one bedroom with a door, an open kitchen with an internal window, and a bathroom. (Tr. 31:21-32:9, 163:15-164:16.) At the time of Defendant's arrest, the apartment had beds in the living room, which was divided by a bed sheet or curtain. (Tr. 31:25-32:1, 164:3-15.)

The arrest team surrounded the residence in order to prevent individuals from escaping or contraband from being thrown out of the windows. (Tr. 155:6-13.) Detective Kelly and another law enforcement officer drove their vehicle to a small parking lot behind the building and observed the rear windows. (Tr. 14:12-21, 15:2-3, 157:8-11.) Inspector McMahon, who was alone, positioned himself on the roof of the building. (Tr. 46:1-12, 156:5-13.) He accessed the roof from the common hallway of the building next to 1215 Nostrand Avenue and climbed a ladder up to the roof. (Tr. 51:2-9; *see also* DX E.) Each of the three adjacent buildings similarly had a common hallway with a fixed ladder that led to a square hatch that was flat to the roof. (Tr. 47:7-11.)

From his position at the rear, Detective Kelly observed Defendant open a rear window of 1215 Nostrand Avenue and put his head and shoulders out of the window, in an apparent attempt

to exit from that window. (Tr. 15:6-17, 30:17-20.) Detective Kelly shouted up to Defendant to get back inside the apartment. (Tr. 15:9-10, 15:18-22.) Defendant went back inside the apartment. (Tr. 15:23-16:5.)

Inspector McMahon, while positioned on the roof of 1215 Nostrand Avenue, heard over the radio that Defendant was attempting to escape out of the rear window and, a few moments later, he heard a creaking of the roof hatch. (Tr. 46:18-24.) Inspector McMahon approached the hatch and saw that Defendant had pushed it open and was attempting to climb up the ladder and escape onto the roof. (Tr. 16:1-25, 46:24-47:4, 47:12-25, 156:8-13.) Defendant's head and the top of his shoulders were out of the hatch. (Tr. 47:22-48:2, 55:15-23.) Inspector McMahon shouted at Defendant, "Police," told him to get back inside, and forced him back down the internal ladder with his feet. (Tr. 47:24-48:2.) Based upon his training and established law enforcement procedures, Inspector McMahon did not attempt to arrest Defendant on the roof, because it was safer to contain him inside the building. (Tr. 48:3-10.)

Inspector Rao, along with other arrest team members, was in the stairwell of the first of the three adjacent buildings when he heard Detective Kelly and Inspector McMahon report over the radio that Defendant attempted to escape via the rear window and the roof, respectively. (Tr. 156:16-157:7.) The arrest team then entered the common hallway of the second adjacent building, before proceeding to 1215 Nostrand Avenue and, ultimately, arrested Defendant in the second floor apartment of 1215 Nostrand Avenue. (Tr. 16:3-12, 157:23-158:5, 158:24-25; *see also* DX E.)

B.      The Seizures

        1.      *Items From the Airshaft*

At the time of Defendant's arrest, the only other individuals in the apartment, besides members of the arrest team, were two women.  (Tr. 16:12-13, 159:23-160:1.)  After being arrested, Defendant was escorted outside to a law enforcement vehicle.  (Tr. 160:4-6.)  The two females were separated from each other and interviewed.  (Tr. 160:6-8.)

One of the women was Aisha Council.  (Tr. 16:21-22, 159:24-25.)  Detective Kelly and Inspector Rao interviewed her in the bedroom.  (Tr. 16:15, 32:10-12, 39:18-21, 160:10-15.)  They first asked Council for pedigree information, such as her name, date of birth, social security number, and last known address, which she provided.  (Tr. 160:22-25, 174:21-175:1.)  Council stated she was Defendant's girlfriend.  (Tr. 17:6.)  Council also stated that Defendant had directed her to go downstairs to lock the front door and then to wait in the bathroom, and she had seen Defendant throw a bag out of the internal window.  (Tr. 17:5-15, 161:1-12.)  Council then made a written statement to memorialize her oral statement.  (Tr. 17:22-18:9, 162:17-163:3; GX 1.)  The written statement, which is dated March 12, 2012 at 9:20 AM and was witnessed by Detective Kelly, reads as follows:

> "This morning when I got out the shower I was told to go downstairs and lock the building door I did.  When I came back up I was told to go back in the bathroom I did once I saw him through [sic] a bag out of the window."

(GX 1.)  Prior to hearing her statement, Detective Kelly and Inspector Rao were not aware that a bag had been thrown outside that window.  (Tr. 19:8-10, 161:13-16.)  Council showed them the window Defendant had thrown the bag out of, which was an internal window leading to an airshaft about six feet by six feet in size.  (Tr. 19:5-7, 19:15-20:2, 162:6-16.)  The airshaft went from the roof to the first floor, but was only accessible through the windows, and the interior part of the shaft was neither accessible nor visible from the street.  (*Id.*)

Inspector Rao then received information that Council had an outstanding arrest warrant in Suffolk County, Long Island for a violation of probation for an underlying drug conviction.[4] (Tr. 36:4-8, 36:13-14, 163:6-9; DX A.) Inspector Rao contacted the RFTF's counterparts in the Long Island division and they took custody of Council. (Tr. 163:9-12.)

The Emergency Services Unit of the NYPD ("ESU") had to be called to retrieve the bag from the airshaft. (Tr. 20:16-20, 166:8-14.) ESU is a NYPD response team equipped to access certain places that regular teams cannot access. (Tr. 20:21-24.) To retrieve the bag, an ESU officer was lowered into the shaft with a rope. (Tr. 20:25-21:4, 166:16-24.) The bag was a large, blue paper shopping bag with carry handles. (Tr. 85:22-23.) Inside the shopping bag was a firearm wrapped in plastic inside a construction helmet, a box of ammunition, and a black toiletry bag with drugs and drug paraphernalia. (Tr. 23:22-24:2, 24:13-15, 62:24-63:14, 64:1-65:16, 219:1-5; GX 2-4, 7-9, 14-17, 20.)

Inspector Rao contacted Special Agent Quinn from the Organized Crime Drug Enforcement Strike Force ("OCDESF") to assist in recovering and seizing the narcotics evidence. (Tr. 60:20-61:6, 61:25-62:2, 168:3-9.) ATF Special Agent Repasky, who was assigned to the OCDESF and was responsible for handling any firearms related to investigations or recoveries, arrived with Agent Quinn to assist with the firearm. (Tr. 218:2-18.)

The firearm was an operable Hi Point, model C9, 9-millimeter pistol with serial number P149104. (GX 22; Tr. 226:9-227:1.) The firearm was loaded with seven rounds of CCI manufactured 9-millimeter ammunition and a box containing 36 rounds of identical ammunition was also found inside the shopping bag. (Tr. 220:16-221:7; GX 15, 17.)

---

[4] On August 4, 2009, Council was convicted upon plea of guilty of Criminal Possession of a Controlled Substance in the Seventh Degree, in violation of NYSPL § 220.03, and Criminal Use of Drug Paraphernalia in the Second Degree, in violation of NYSPL § 220.50. (DX A.)

The toiletry bag contained three drug exhibits. The first was 41.1 grams of cocaine base with a purity level of 38.6 percent. (GX 7, 21 ¶ 1; Tr. 68:8-69:22.) The second was 8.4 grams of powder with no controlled drug substances detected, which Special Agent Quinn testified was commonly referred to as an adulterant or "cut" that increases the amount of narcotic product for sale. (GX 8, 21 ¶ 2; Tr. 69:24-70:20, 73:10-24.). The third was 70 capsules with a net weight of 16.2 grams of 3, 4-methylenedioxymethcathinone and butylone, which is a controlled substance in the MDMA family. (GX 9, 21 ¶ 3; Tr. 70:21-71:15, 71:25-72:1.)

The nondrug contents of the toiletry bag consisted of: a plastic bowl with a plastic cover, two scales, a strainer, a large silver spoon, a bag containing smaller plastic bags, two folded-up cardboard fliers, other paraphernalia and loose bags, plastic bags with residue, and a small battery. (Tr. 66:4-22.) Special Agent Quinn testified that several of the items appeared to have drug residue. (Tr. 66:10-11.)

### 2. Other Seizures From the Apartment

The second woman in the apartment at the time of Defendant's arrest, identified at the hearing only as Caballero, was interviewed by Inspector Rao after he spoke with Council. (Tr. 163:13-18.) Caballero stated she lived in the living room area of the residence and that Defendant had been residing in the apartment and slept in the bedroom. (Tr. 163:19-23.) Inspector Rao obtained a consent to search from Caballero. (Tr. 164:17-18.)

At a certain point after Defendant and Council separately had been taken into custody and removed from the apartment, a woman named Traci Powell ("Powell") arrived at the apartment. (Tr. 164:20-22.) Powell identified herself as the owner of the apartment and stated that the occupants of the apartment were not authorized to live there and had been "squatting." (Tr. 25:5-26:18, 164:20-25.) Detective Kelly and Inspector Rao obtained her consent to search the

apartment. (Tr. 164:25-165:21; GX 5.) The arrest team then conducted a preliminary search of all the rooms in the apartment. (Tr. 165:23-166:1.)

In the bedroom, the arrest team found, *inter alia*, men's clothing, documents, powered cocaine and pills. (Tr. 75:19-25, 171:4-8.) The powdered cocaine consisted of 11.2 grams of cocaine hydrochloride with a purity level of 34.1 percent. (GX 10-11, 21 ¶ 4; Tr. 72:15-73:6, 76:17-77:4.) The pills were nine tablets with a net weight of 3.9 grams of 1-benzylpiperazine, three tablets with a net weight of .73 grams of alprazolam, and three capsules with a net weight of .68 grams of 3, 4-methylenedioxymethcathinone and butylone. (GX 11, 21 ¶ 5.) The drug items were found on the floor in the bedroom in plain view. (Tr. 74:15-19, 76:10-16.) The documents found were: a Connecticut driver's license with the name Wilson Guzhnay and Defendant's photograph, a New York State driver's license with the name Daren Brown and the photo of an unknown individual, a dry cleaners receipt, a small address and telephone book, a Judgment and Commitment Order in Defendant's name for the instant case, and a copy of Defendant's birth certificate. (Tr. 77:20-79:23.)

Special Agent Repasky took custody of the firearm. (Tr. 168:15-17.) Special Agent Quinn took custody of the drug exhibits, including the toiletry bag, took them back to the Drug Enforcement Agency's New York Field Division, processed them as evidence, and submitted them to the Northeast Regional Lab for testing and safekeeping. (Tr. 63:17-23.)

C.    DNA Analysis of the Firearm

After Defendant's arrest, Special Agent Repasky collected a DNA sample from Defendant's inner cheek at the Metropolitan Detention Center ("MDC") Brooklyn, pursuant to a warrant. (Tr. 229:5-230:2.) Wong, an analyst at the New York City Office of the Chief Medical Examiner, created a DNA profile based on the DNA swab from Defendant. (Tr. 116:22-117:2.)

Wong received a DNA swab taken from the Hi Point, model C9, 9-millimeter pistol, serial number P149104, found in the shopping bag, and created a DNA profile. (Tr. 115:14-15.) The swab was taken from the grip, trigger, trigger guard, and slide of the firearm. (Tr. 115:18-20.) The DNA profile from Defendant conclusively matched the DNA profile from the firearm. (Tr. 117:3-8.)

The minimum amount of DNA required to generate a DNA profile is 20 picograms per microliter and the swab from the firearm had 210.45 picograms per microliter of DNA, more than ten times the amount necessary to generate a profile. (Tr. 115:21-116:12.) Wong performed a statistical calculation on the DNA from the firearm and found the DNA profile of the firearm is unique as to one in over 6.8 trillion unrelated people.[5] (Tr. 117:9-14, 120:3-12.) In addition, Wong testified, that while there could be another person's DNA on the swab from the firearm, any amount of foreign DNA was insufficient to generate a DNA profile. (Tr. 118:19-119:7.) Significantly, while secondary transfer[6] of DNA is possible, in this instance, it is unlikely that the DNA on the firearm was transferred secondarily in light of the large amount of Defendant's DNA that was on the firearm swab. (Tr. 130:8-9, 145:11-15, 146:3-7.)

D.    Attempts to Locate Council

Council did not testify at the VOSR hearing. The government averred that they could not locate her. Testimony concerning these efforts was elicited at the hearing. Prior to the hearing, Special Agent Repasky had made efforts to locate Council. (Tr. 230:5-7.) In November 2012, she obtained Council's identification information, and ran a "rap sheet," which provides her criminal history. (Tr. 230:10-231:4.) Special Agent Repasky spoke with Council's Suffolk

---

[5] Wong testified that there are approximately 6.8 billion people in the world. (Tr. 120:7-9.)

[6] Wong explained that an example of secondary transfer would be if two people shook hands, and one person's DNA was transferred onto an object via the other person's hand. Wong testified that studies have shown that it is unlikely secondary transfer would provide sufficient DNA to generate a DNA profile. (Tr. 130:4-9.)

County Probation Officer, who provided two addresses and two phone numbers associated with Council. (Tr. 231:5-8.) One of the phone numbers was disconnected and Special Agent Repasky left a message at the other phone number (Tr. 231:14-18.) Using law enforcement databases, Special Agent Repasky identified additional addresses that she visited in January 2013. (Tr. 231:16-18, 237:14-16.) Several of the addresses were either abandoned or the individuals residing there stated they had recently moved in and did not know Aisha Council. (Tr. 231:19-25, 233:5-234:2.) Another address was for Council's aunt, a Department of Corrections officer, who stated that, while Council used to live with her, she had not spoken to Council since shortly after Council's arrest in March 2012. (Tr. 323:12-20.) Council's mother lives in Virginia and Council's aunt stated Council's mother did not know where she was either. (Tr. 235:11-16, 236:3-4.) Special Agent Repasky did not contact Council's mother by phone or by a home visit. (Tr. 235:25-236:7.)

During February and March 2013, a Suffolk County sergeant conducted a follow-up visit to the two addresses that Special Agent Repasky found abandoned and further researched Council's whereabouts. (Tr. 234:6-17, 237:17-21.) He was not able to locate her. (Tr. 234:16-17.) Special Agent Repasky continued to check law enforcement databases for additional addresses or recent arrests for Council. (Tr. 235:25-236:2.) The last time she did so was the week prior to the VOSR hearing, but no new information was obtained. (247:14-16.)

## DISCUSSION

### I.    Motion *in Limine*

Before the Court is Defendant's motion *in limine* to preclude receipt into evidence of alleged oral and written hearsay statements of Council, who was not called to testify at the

VOSR hearing. The government opposes the motion. For the reasons set forth below, the motion is denied.

A.    <u>Legal Standard</u>

"Revocation proceedings are not deemed part of a criminal prosecution, and, therefore, defendants in such proceedings are not entitled to 'the full panoply of rights' that criminal defendants generally enjoy." *United States v. Carthen*, 681 F. 3d 94, 99 (2d Cir. 2012), *cert. denied* __ U.S. __, 133 S. Ct. 837 (Jan. 7, 2013) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). "'[T]he Federal Rules of Evidence do not apply with their normal force in supervised release revocation [or modification] hearings,' and a district court need only base its findings 'on verified facts' and 'accurate knowledge.'" *United States v. Zielinski*, 2013 WL 536095, at *4 (2d Cir. Feb. 14, 2013) (quoting *United States v. Bari*, 599 F. 3d 176, 179 (2d Cir. 2010)) (additional internal quotations omitted). While the Confrontation Clause and the Federal Rules of Evidence are inapplicable to probation revocation proceedings, a defendant threatened with probation revocation has rights to certain procedural protections under the Due Process Clause and Federal Rule of Criminal Procedure 32.1. *United States v. Aspinall*, 389 F. 3d 332, 340 (2d Cir. 2004), *abrogation on other grounds recognized by United States v. Fleming*, 397 F. 3d 95, 99 n.5 (2d Cir. 2005). The confrontation right of a defendant in a violation hearing is governed by Fed. R. Crim. P. 32.1(b)(2)(C), which provides that, at a revocation hearing, a defendant is entitled to "an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." Fed. R. Crim. P. 32.1(b)(2)(C); *see also Morrissey*, 408 U.S. at 489.

The Court first must determine whether a proffered hearsay statement falls within an established exception. If the statement does so fall, it is of course admissible in a revocation

hearing.  *See Carthen*, 681 F. 3d at 100.  If the statement is hearsay, then the Court must determine whether there is "good cause" for its admission.  *Id.*; Fed. R. Crim. P. 32.1(b)(2).  "For statements that would be inadmissible under the Federal Rules of Evidence, a determination of 'good cause' requires the court to balance 'the defendant's interest in confronting the declarant[ ] against[ ] . . . the government's reasons for not producing the witness and the reliability of the proffered hearsay.'"  *Carthen*, 681 F. 3d at 100 (quoting *United States v. Williams*, 443 F. 3d 35, 45 (2d. Cir. 2006)).  In addition, "the defendant's interest is entitled to little weight if the defendant caused the declarant's absence by way of intimidation."  *Id.*

B.     Application

At the VOSR hearing, the Court allowed Council's statements to be introduced, without prejudice to Defendant's renewal of his objections to their admission into evidence.  (Tr. 11:1-15.)  Defendant did renew his objections.

Defendant seeks to exclude from evidence the oral and written statements Council made to Inspector Rao and Detective Kelly that Defendant directed her to go downstairs to lock the front door and then to wait in the bathroom, and that she saw Defendant throw a bag out of an internal window leading to a narrow airshaft.  (Tr. 17:5-15, 17:22-18:9, 161:7-12, 162:17-163:3; GX 1.)  With the help of the ESU, the arrest team subsequently recovered the bag from the airshaft, which contained, *inter alia*, a loaded firearm with Defendant's DNA and narcotics.

Defendant argues that Council's statements do not fall under any hearsay exception and Defendant has a strong interest in confronting Council.  (Def. Mot. at 2.)  Furthermore, Council's reliability is "highly suspect" because, at the time of her arrest, she was a fugitive on a violation of probation warrant issued in Suffolk County and, therefore, "was looking out for her own interests" and had motive to implicate Defendant so as to exculpate herself.     (*Id.*)  The

government argues that good cause exists for the admission of the hearsay statements because: (1) the government made diligent efforts to locate Council, but was unsuccessful, and (2) the hearsay evidence is reliable.  (Gov't Opp. at 3.)  For the reasons set forth below, Defendant's motion *in limine* is denied.

Council's statements do not fall into any hearsay exception and the Court acknowledges that Defendant has a "strong interest" in confronting the declarant.  Therefore, the issue before the Court is whether Defendant's strong interest in confronting Council is outweighed by the reasonableness of the government's efforts to locate Council and the reliability of the hearsay evidence, such that the government has shown "good cause" to admit the hearsay statements into evidence.

The government's proffered reason for not calling Council to testify at the violation hearing is that the government cannot locate her.  As Special Agent Repasky credibly testified, the government made reasonable efforts to locate Council: (1) agents conducted numerous searches from November 2012 until May 2013 in law enforcement databases to identify residences where Council has lived or lives currently; (2) agents visited five different residences between January 18 and January 25, 2013; (3) agents interviewed occupants of those residences to determine Council's whereabouts; (4) a Suffolk County sergeant conducted follow-up visits in February and March 2013 at the residences Special Agency Repasky found abandoned; and (5) agents interviewed Council's aunt and Council's Suffolk County Probation Officer.  (Tr. 230:8-235:16.)

Moreover, Council's statements are reliable.  Council's oral statements were made as she was interviewed inside the apartment, just after Defendant was arrested, and before Inspector Rao learned that she had an outstanding arrest warrant.  She made her written statement on the

scene shortly after making her oral statement. There was no testimony that any federal agent or officer on the scene made any promises to Council to get her to disclose any information about Defendant. Indeed, she was subsequently transported to Suffolk County where she was further prosecuted for her violation of probation.

Notably, the arrest team was not aware that the bag thrown out the window even existed before Council told them. The fact that they found the bag where she had indicated it would be corroborates her statements. The government conclusively proved that Defendant's DNA was on the firearm that was inside the bag and no other DNA was found on the firearm in an amount sufficient enough to create a DNA profile. Significantly, the fact that Defendant attempted to abscond from the scene and does not contest the additional violation charges of drug use is further evidence that the bag, which contained drugs, belonged to Defendant and corroborates Council's statements.[7] Finally, additional drugs matching the drugs found in the toiletry bag were recovered from Defendant's bedroom along with identification documents belonging to Defendant.

Defendant argues Council is not credible because Council had motive to lie about Defendant throwing the bag out of the window into the airshaft, in order to implicate Defendant and exculpate herself. The evidence does not support this theory. The airshaft was narrow and enclosed and was neither visible nor accessible from the street. Indeed, ESU had to be called and a law enforcement officer lowered by rope to retrieve the bag. Therefore, it is unlikely the arrest team would have discovered the bag and Council would not have had anything to gain by directing the arrest team to the allegedly incriminating evidence. There was no reason for Council to think the arrest team could see it from the street, would look out the window for the

---

[7] Notably, Defendant does not contest the admissibility at the hearing of the bag and its contents. Defendant did not contest at the VOSR hearing, and, on May 30, 2013, pled guilty to violation Charges One, Two, and Three, which include drug use and failure to attend drug treatment. (*See* 5/30/13 Min. Entry.)

bag on their own, or assume that the bag had come from that apartment. If Council wanted to exculpate herself, it is more likely she would have said nothing about the bag.

Defendant further argues that the government has not presented any evidence that Defendant intimidated Council or there was a history of violence between the two such that Council would be afraid to testify. While courts have relied on intimidation of a declarant as a factor supporting admission of hearsay at revocation hearings, intimidation or violence is not a prerequisite for admissibility. In *Carthen*, the Second Circuit upheld the district court's admission of hearsay statements from two non-testifying witnesses absent any intimidation "given the strength of the record viewed as a whole." *Carthen*, 681 F. 3d at 101.

As the government made reasonable efforts to find Council and Council's statements are reliable, the government has shown good cause for the admission of Council's statements into evidence. Accordingly, Defendant's motion *in limine* to exclude Council's hearsay statements is denied.

## II. Conclusions of Law As to the VOSR Hearing

At a violation of supervised release hearing, the governing standard is whether the government has proven the alleged violations of supervised release by a preponderance of the evidence. Fed. R. Crim. P. 32.1(d); 18 U.S.C. § 3583(e)(3); *see also Carthen*, 681 F. 3d at 99-100. Even where a defendant has not been charged or convicted with a separate federal, state, or local crime, his conduct alone constitutes a crime in violation of his supervised release. The U.S. Sentencing Guidelines Manual's commentary on Section 18 U.S.C. §§ 3563(a)(1) and 3583(d) provides, in pertinent part:

> "A mandatory condition of probation and supervised release is that the defendant not commit another federal, state, or local crime. A violation of this condition may be charged whether or not the defendant has been the subject of a separate federal, state, or local prosecution for such conduct. The grade of violation does

not depend upon the conduct that is the subject of criminal charges or of which the defendant is convicted in a criminal proceeding. Rather, the grade of the violation is to be based on the defendant's actual conduct."

U.S. Sentencing Guidelines Manual § 7B1.1 Classification cmt. n. 1 (2010).

A.    Charge Four: Criminal Possession of a Firearm Related to the September 1, 2011 Traffic Stop

Based upon the totality of the circumstances presented at the hearing, the Court finds that there is a preponderance of the evidence that Defendant possessed the firearm found in the car he was driving on September 1, 2011 in Queens, New York.

"Under New York Penal Law § 265.15(3), the existence of a firearm in an automobile creates a permissive—not mandatory—presumption that all occupants of the vehicle have common constructive possession of the firearm, absent specific exceptions [the "automobile presumption"]." *Matthews v. City of New York*, 889 F. Supp. 2d 418, 434 (E.D.N.Y. 2012); *see also People v. Russo*, 223 A.D. 2d 484 (1st Dept. 1996) (the People's uncontroverted evidence of defendant's presence in the automobile at the time three firearms were discovered therein, was sufficient to establish defendant's guilt beyond a reasonable doubt).[8]

As none of the statutory exceptions[9] to the automobile presumption apply here, Defendant is presumed to have had possession of the firearm found in the vehicle and it is Defendant's burden to rebut the presumption. *Lemmons*, 40 N.Y. 2d at 510 ("The statutory presumption establishes a *prima facie* case against the defendant which presumption he may, if he chooses, rebut by offering evidence."). Defendant has failed to do so here.

---

[8] Section 265.15(3) states as follows: "The presence in an automobile . . . of any firearm . . . is presumptive evidence of its possession by all persons occupying such automobile at the time such weapon . . . is found." NYSPL § 265.15(3).

[9] The automobile presumption does not apply if: (1) the firearm is found on an occupant's person; (2) the vehicle is lawfully operated as a taxi, in which instance the duly licensed driver is not subject to the presumption; or (3) an occupant has in his possession a valid license to have and carry a firearm. NYSPL § 265.15(3).

First, Defendant was driving the car in which the firearm was found. When stopped by law enforcement, Defendant provided Officer Grimm with a North Carolina driver's license with his name and photo and a rental agreement bearing Defendant's name. Second, Officer Grimm properly conducted a visual inspection of the car. "Police officers may make a 'brief, investigatory stop' when they have a 'reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Jenkins*, 324 F. Supp. 2d 504, 508-09 (S.D.N.Y. 2004) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). Whether law enforcement has a reasonable suspicion that criminal activity is afoot is determined by examining the "totality of the circumstances." *Diamondstone v. Macaluso*, 148 F. 3d 113, 124 (2d Cir. 1998). "Probable cause and reasonable suspicion to stop and arrest a driver of a vehicle exist '[w]hen an officer observes a traffic offense—however minor.'" *Id.* (quoting *United States v. Scopo*, 19 F. 3d 777, 782 (2d Cir. 1994)) (internal quotations and citations omitted).

Officer Grimm witnessed Defendant's vehicle fail to stop at two stop signs and, after he had pulled the vehicle over, smelled marijuana coming from the open windows. Therefore, there was probable cause for the traffic stop and visual inspection of the vehicle. The firearm was in plain view from the passenger side of the vehicle and Officer Grimm did not reach inside the vehicle to discover the firearm. Notably, given that the butt of the firearm was protruding from under the passenger seat, in plain view, and Defendant reached over to the glove compartment on the front passenger side of the vehicle to get the vehicle rental form, it is more likely than not that Defendant knew the gun was there.

Moreover, Defendant fled upon discovery of the firearm. "Under New York law, evidence of flight is admissible as a form of circumstantial evidence of consciousness of guilt."

*Robinson v. Ercole*, 2008 WL 2522506, at *5-6 (E.D.N.Y. June 20, 2008) (citing *People v. Yazum*, 13 N.Y. 2d 302 (1963)).

Defendant contends that the firearm was found under the passenger side of the vehicle where Newkirk was seated and there is no evidence that Defendant knew the firearm was in the vehicle. These facts are not sufficient to rebut the automobile presumption by a preponderance of the evidence. *See People v. Miller*, 237 A.D. 2d 535, 536 (2d Dept. 1997) (the automobile presumption applied to all occupants of a vehicle upon discovery of the butt of a gun sticking out from under the driver's seat); *People v. Terry*, 148 A.D. 2d 478, 479 (2d Dept. 1989) (court's reliance on the automobile presumption was sufficient to establish defendant's guilt even where defendant testified he was unaware of the presence of a gun found in the front seat of a car). In fact, even if the weapon is located inside a bag or a jacket within the automobile that is not being worn or claimed by an occupant, a trier of fact may infer possession absent rebuttable evidence. *See Lemmons*, 40 N.Y. 2d at 511 (firearms found in a handbag on the floor of a vehicle that came into plain view of policeman as he was conducting legitimate police inquiry, constituted sufficient evidence of common possession to sustain defendants' convictions for possession of a dangerous weapon); *Matthews*, 889 F. Supp. 2d at 435 (permissive nature of the automobile presumption allows a trier of fact to infer possession of all occupants of a vehicle, even where firearm was discovered within a jacket pocket and the jacket was not worn or claimed by any occupant).

Defendant also contends that Newkirk's previous conviction for possessing a firearm makes it more likely that the firearm belonged to him. However, this argument fails because Defendant also has prior convictions and arrests involving the use of weapons. (*See* VOSR

Report at 4-5.)  Additionally, as discussed below, the government proved by a preponderance of the evidence, Defendant's possession of a firearm approximately six months later.

Defendant has failed to put forth any evidence that the firearm was not his or that the firearm belonged to Newkirk and the absence of DNA or fingerprint evidence alone does not rebut the presumption by a preponderance of the evidence.  As Defendant has failed to rebut the automobile presumption, the firearm was in plain view, and Defendant fled from the scene upon discovery of the firearm, there is a preponderance of the evidence that Defendant violated his supervised release by being in possession of a firearm on September 1, 2011.

B.      Charge Five: Criminal Possession of a Firearm Related to the March 12, 2012 Arrest

Based upon the totality of the circumstances presented at the hearing, the Court finds that there is a preponderance of the evidence that Defendant possessed the firearm found at 1215 Nostrand Avenue in Brooklyn, New York on March 12, 2012.

First, it is more likely than not that the shopping bag found on March 12, 2012 at 1215 Nostrand Avenue belonged to Defendant.  Council's statements that Defendant threw the bag out of the window are corroborated by the arrest team finding the bag where she had indicated. Defendant's contention that Council had motive to implicate Defendant to shift the blame from herself, is belied by the fact that the airshaft was a small, internal space, neither visible nor accessible from the street, such that ESU had to be called to retrieve the bag.  Thus, it is unlikely the arrest team would have found the bag without Council directing them to it.

Moreover, the DNA profile from the firearm in the shopping bag uniquely matched Defendant's DNA profile and, therefore, there is a preponderance of the evidence that Defendant possessed the firearm inside the shopping bag.  The large amount of Defendant's DNA on the firearm, particularly on the trigger, trigger guard, slide and grip, and the lack of evidence

pointing to the presence of any other person's DNA, is clear and convincing evidence that Defendant was in possession of the firearm.

Defendant's contention that his DNA was found on the firearm through secondary transfer from the helmet or the plastic bag is speculative and not credible. Wong credibly testified that, not only is secondary transfer generally unlikely, but it was particularly unlikely here because of the large amount of Defendant's DNA on the firearm swab. Moreover, the DNA from the firearm was swabbed on four different parts: grip, trigger, trigger guard, and slide. When the arrest team found the firearm, it was wrapped in plastic and only a small part of the slide was protruding from the plastic and exposed to the helmet. It is highly unlikely that such a large amount of Defendant's DNA was secondarily transferred from the helmet to a portion of the slide. The more likely conclusion is that there was a large amount of Defendant's DNA on the firearm because Defendant possessed it. Thus, there is a preponderance of the evidence that Defendant violated his supervised release by being in possession of the firearm discovered on March 12, 2012.

C.     Charge Six: Possession of a Controlled Substance

Based upon the totality of the circumstances presented at the hearing, the Court finds that there is a preponderance of the evidence that Defendant possessed the drugs inside the toiletry bag found in the shopping bag along with the firearm.

As discussed above, Defendant's DNA was on the firearm found in the same shopping bag as the toiletry bag and Defendant threw the shopping bag out of the window when law enforcement arrived at his residence. Therefore, it is more likely than not that the drugs and drug paraphernalia found in the toiletry bag belonged to Defendant. Despite Defendant's contentions, Council's prior narcotics conviction does not make her a drug user nor make it more likely the

drugs were hers.  In particular, this argument holds little weight because Defendant's underlying charge in the instant action is a narcotics conviction for possessing and distributing heroin and he had a prior local conviction for attempted criminal possession of cocaine with the intent to sell.

There is also a preponderance of the evidence that Defendant possessed the drugs found in the bedroom.  It is more likely than not that Defendant resided in the bedroom in the apartment.  Caballero told Inspector Rao that Defendant was living in the apartment and resided in the bedroom.  Furthermore, important documents bearing Defendant's name were found in the bedroom, including a driver's license with his picture and a false name, a copy of his birth certificate, and the Judgment and Commitment Order from the instant case.  Moreover, the pills found on the floor of the bedroom were the same type of pills found in the toiletry bag, and both sets of pills tie back to Defendant.  Thus, there is a preponderance of the evidence that Defendant violated his supervised release by being in possession of a controlled substance.

D.      Charge Seven: Resisting Arrest

Lastly, based upon the totality of the circumstances presented at the hearing, the Court finds that there is a preponderance of the evidence that Defendant resisted arrest on March 12, 2012 by attempting to flee from and blocking their access to the apartment.

Under New York State Penal Law Section 205.30, a "person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer or peace officer from effecting an authorized arrest of himself or another person."  NYSPL § 205.30.  "Resisting arrest does not require that the person being arrested use force or violence.  It is enough that he engage in some conduct with the intent of preventing the officer from effecting an authorized arrest of himself or another person."  *People v. Stevenson*, 31 N.Y. 2d 108, 112 (1972) (internal quotations omitted).

Detective Kelly's credible testimony that Defendant attempted to flee via the rear window was corroborated by the testimony of Inspectors McMahon and Rao, who testified that Detective Kelly advised the team over the radio that Defendant was attempting to flee via the rear window. Detective Kelly testified that Defendant put his head and shoulders out of the open window, which is behavior more consistent with an attempt to exit the window, than merely observing what is going on. Detective Kelly also testified that he had driven from the street to a small parking lot behind the building. Consequently, but for law enforcement securing the rear of the building, Defendant would have been able to flee the area from the rear window.

In addition, Inspector McMahon's credible testimony that Defendant subsequently attempted to flee via the roof was corroborated by the testimony of Detective Kelly. Inspector McMahon testified that he saw Defendant's head and the top of his shoulders pop up from the roof hatch and he immediately directed Defendant to get back inside and had to physically push the hatch closed. Moreover, the video shown by the defense at the VOSR hearing displays the ladder and hatch that Inspector McMahon testified he climbed to access the roof. (*See* DX E.)[10] Defendant had to climb a similar vertical, fixed ladder up to a hatch that pushed outwards, and then pull himself up to the roof through the hatch. It defies credulity that someone would climb such a ladder and push up through a hatch, merely out of curiosity. Instead, it is more likely than not that Defendant was attempting to flee via the roof after unsuccessfully attempting to flee out of the rear window.

---

[10] The parties stipulated that defense exhibit E was a video of the events of March 12, 2012, reflecting the arrest of Defendant to the extent captured on the video. (Tr. 188:4-7.) The video was obtained from YouTube.com; the party or parties who filmed and uploaded the video to the Internet are unknown and the accuracy of the video was not testified to by any witness at the hearing. (*See* Tr. 188:21-189:12.)

Lastly, Defendant previously had fled from law enforcement on September 1, 2011, after Officer Grimm found a firearm in the vehicle he was driving. Having successfully evaded capture once through flight, Defendant apparently sought to do so again.

Defendant contends that no member of the arrest team told Defendant they had a warrant for his arrest or that he would be arrested. Defendant's argument lacks merit. Where a person's knowledge of impending arrest may be inferred from the surrounding facts and circumstances, an officer need not "specifically inform" the person that he is to be arrested in order to establish an intent to resist arrest. *People v. Galvin*, 253 A.D. 2d 437, 438 (2d Dept. 1998); *People v. Gray*, 189 A.D. 2d 922, 922-23 (3d Dept. 1993). It is unlikely, if not impossible to believe, that Defendant did not know the RFTF arrest team was attempting to arrest him.

Importantly, as already discussed, several months prior Defendant had fled and avoided capture for the firearm found in his rental vehicle. Given Defendant's prior contacts and experience with the Criminal Justice System and his acknowledgment of the conditions of his supervised release, at the very least, he should have known or been aware that his Probation Officer in this case was looking for him.

In addition, when the arrest team arrived on Nostrand Avenue, Defendant told Council to lock the building door and dropped a bag with a firearm and narcotics out of an internal window. These were apparent attempts to block the law enforcement officers' access to the building and buy Defendant time to hide evidence and flee. This is supported by his unsuccessful attempt to flee out of the rear window and via the roof. Thus, there is a preponderance of the evidence that Defendant violated his supervised release by resisting arrest on March 12, 2012.

## CONCLUSION

For the reasons set forth above, Defendant's motion *in limine* is denied and the Court finds Defendant has violated the following conditions of supervised release by a preponderance of the evidence: Charge Four, criminal possession of a firearm related to a September 1, 2011 incident; Charge Five, criminal possession of a firearm related to a March 12, 2012 incident; Charge Six, possession of a controlled substance; and Charge Seven, resisting arrest.


SO ORDERED.

Dated: Brooklyn, New York
     May 31, 2013

_____
/s/
DORA L. IRIZARRY
United States District Judge
